IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TODD GLADYSIEWSKI,              )
        Plaintiff,              )
                                 )
        vs.              )        Civil Action No. 05-992
                                 )
ALLEGHENY ENERGY SERVICE        )        Judge Cercone
CORPORATION,                    )        Magistrate Judge Hay
        Defendant.              )

REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant (Docket No. 45) be granted.

II.     Report

Plaintiff, Todd Gladysiewski, brings this action against his employer, Defendant

Allegheny Energy Service Corporation ("Allegheny"), contending that Allegheny's decision to

demote him from a Serviceman A position to a Serviceman B position on October 8, 2004

constituted unlawful discrimination against him based on his age (41), in violation of the Age

Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA) and the Pennsylvania Human

Relations Act, 43 P.S. §§ 951-63 (PHRA).  He further alleges that Allegheny retaliated against

him for filing a claim of age discrimination.

Presently before this Court for disposition is a motion for summary judgment, submitted

on behalf of the Defendant.  For the reasons that follow, the motion should be granted.

Facts

Allegheny delivers electric service, an essential public service which vitally

affects the health, safety, comfort and general well-being of large numbers of people. (Bowser Decl. ¶ 5.)[1]  Plaintiff works at the Lines, Installer and Service Center in Kittanning, Pennsylvania ("Kittanning Service Center"), where Allegheny employs utility linemen who install, remove, maintain and repair power lines and related equipment.  (Bowser Decl. ¶ 6.)

The Kittanning Service Center where Plaintiff works operates under the Collective Bargaining Agreement ("CBA") between Allegheny and the Utility Workers of America Local 1021 ("Union"), which provides for wage standards, classifications, and progressions for line and servicemen, including: Apprentice, C, B, A, and Lead Lineman and Serviceman classifications. Under the terms of the CBA, the C, B, and A classifications each have three wage rate progressions: minimum, first step, and maximum.  Apprentice has four wage rate progressions: minimum, first step, second step, maximum.  (Gladysiewski Dep. at 9, 350-52 & Ex. 21 (CBA) at 135-43.)[2]

There is no fixed number of classification progressions at the Kittanning Service Center, and every Lineman and Serviceman is expected to advance through the progression to the A classification.  (Bowser Decl. ¶ 7.)  In addition to pay, differences between the Serviceman A and B classifications include the "complexity of the work and the knowledge needed to keep yourself from getting hurt or hurting others," as employees work with high voltage electricity. (Gladysiewski Dep. at 20.)  Servicemen A are expected to be able to independently investigate and analyze service issues and determine how to correct those issues.  See Gladysiewski Dep. Ex. 7 (Serviceman A job description).  While Servicemen B perform similar duties, they do so under

_____

[1]Def.'s App. (Docket No. 48) Tab A.

[2]Def.'s App. Tab B.

the supervision and direction of a higher-rated employee.  (Gladysiewski Dep. at 21 & Ex. 8

(Serviceman B job description).)  Also, employees in the A classification are included on the

primary call-out list which is used for making assignments (usually on an overtime basis) that

involve dealing directly with customers and addressing their service issues, oftentimes as a

single-person crew.  (Gladysiewski Dep. at 20-22; Bowser Decl. ¶ 8.)

Jack Bowser, General Manager, Operations for Allegheny, who is responsible for the

Kittanning Service Center (Bowser Decl. ¶ 4), states that:

> A Serviceman A, in addition to performing complex repairs and
> installations, must be able to investigate customer complaints and service
> irregularities to determine what, if any, action must be taken to correct the
> situation.  Employees in the A classification are expected to be able to
> successfully complete certain work assignments as a single-person crew and
> without assistance.  A Serviceman B does not need to posses the same level of
> analytical skills as a Serviceman A.

(Bowser Decl. ¶ 9.)

Because working with electricity and high voltage power equipment is potentially

hazardous, and accidents and mistakes can result in fatalities (Gladysiewski Dep. at 22), it is

essential to Allegheny that Servicemen and Linemen continuously demonstrate that they know

how to perform the work, are ready, willing and able to perform it safely and effectively, and can

effectively work with other crew members and managers as a team.  (Bowser Decl. ¶ 10;

Gladysiewski Dep. at 20.)

<u>Plaintiff Is Hired and Advances to Serviceman A</u>

Plaintiff was born on January 17, 1963.  Allegheny hired him in 1987 as a Laborer, and

Plaintiff is a current Allegheny employee.  (Gladysiewski Dep. at 6, 8, 14.)  After about a year as

a Laborer, Plaintiff took a job as a meter reader at the Kittanning Service Center; he then

progressed to Serviceman Apprentice (for approximately 1.5 years); Serviceman C (for approximately 1.5 years); Serviceman B (for approximately 1.5 years); and then Serviceman A. (Id. at 14-18.)  He became classified as a Serviceman A, minimum wage progression, in or about 1993.  To advance from Serviceman C to B and then to A, Plaintiff was required to attend and complete schooling provided by Allegheny.  (Id. at 15-17.)

After working as a Serviceman A for approximately six months, Plaintiff was evaluated and was progressed to the first step wage progression for the A classification. (Gladysiewski Dep. at 18-19.)  Approximately six months later, Plaintiff was evaluated again and was progressed to the maximum step for the A classification.  (Id. at 19-20.)  Plaintiff remained in this position at the Kittanning Service Center and at this step from approximately 1994 until October 2004, when he was reclassified to the minimum wage progression for the Serviceman B classification.  (Id. at 20.)

<u>Smith and Bowser Decide to Demote Plaintiff</u>

Dave Smith has been the Manager, Electric Operations, at the Kittanning Service Center, as well as Plaintiff's manager and immediate supervisor, since about 1996.  Smith has reported to Jack Bowser since December 8, 2002.  (Gladysiewski Dep. at 25-26, 48; Smith Decl. ¶ 1;[3] Smith Dep. at 14;[4] Bowser Decl. ¶ 11.)

Smith states that, in September 2004, based on months of observations and assessments, both he and Bowser concluded that Plaintiff, among other things, failed to follow instructions, failed to fully perform assigned work, and refused to participate in safety training.  (Smith Decl.

_____

[3]Def.'s App. Tab F.

[4]Def.'s App. Tab D.

¶ 5.)  Smith and Bowser determined that Plaintiff's conduct and behavior was consistently deficient, and this was observed and reported by others.  In their judgment, despite corrective coaching and counseling, Plaintiff had not sufficiently improved his performance.  (Smith Decl. ¶ 6; Bowser Decl. ¶ 13.)

Based on what Smith and Bowser considered Plaintiff's ongoing deficiencies and apparent unwillingness or inability on his part to demonstrably improve them, they discussed Plaintiff's performance with Todd Faulk, Allegheny's General Manager of Personnel Relations.  (Bowser Decl. ¶ 14; Smith Dep. at 34-35.)  Faulk is responsible for administering Allegheny's collective bargaining agreements.  (Faulk Decl. ¶ 2.)[5]

As a matter of company practice, Bowser and Smith did not have the sole authority to take employment actions against an employee, and such actions typically would be, as was the case for Plaintiff, the result of a discussion, consensus, and determination by and between Smith and Bowser, with Faulk's review and concurrence that any proposed course of action was in compliance with the CBA and consistent with expectations and actions taken with other employees company-wide.  (Smith Dep. at 34-35; Bowser Decl. ¶ 15; Faulk Decl. ¶ 7.)

Bowser and Smith informed Faulk that Plaintiff was not, in their judgment, adequately demonstrating that he could effectively and, therefore, safely perform the duties of his Serviceman A classification.  In their judgment, Plaintiff demonstrated, among other deficiencies, a lack of teamwork and involvement in his work, failed to show he could adequately comprehend and follow directions, and demonstrated a poor attitude towards management, co-workers, and an apparent unwillingness or inability to perform Serviceman A duties.  (Bowser

---

[5]Def.'s App. Tab E.

5

Decl. ¶ 16; Smith Decl. ¶ 7.)

On or about October 1, 2004, Smith prepared a non-exhaustive chronological summary of certain events that he considered to be Plaintiff's work performance deficiencies. (Smith Decl. ¶ 8 & Ex. 1.)  The two-page document, entitled "Work Performance Summary, Todd Gladysiewski, 10/01/2004" ("Work Performance Summary"), chronicles multiple events involving Plaintiff and observed performance deficiencies.  See Def.'s App. Tab G.

After considering the information presented to him by Smith and Bowser, Faulk agreed with them that a reduction in Plaintiff's classification and wage grade, along with an action plan to improve Plaintiff's performance was warranted and in accord with the CBA. (Faulk Decl. ¶ 8.)

The October 8, 2004 Meeting

On October 8, 2004, Smith and Bowser met with Plaintiff and his Union representative. Plaintiff was given a letter which stated as follows:

> This letter is to inform you that you are being demoted to the classification of Serviceman B, minimum, effective October 10, 2004 as a result of your failure to adequately demonstrate that you can safely and effectively perform the job duties of Serviceman A.
>
> After numerous coaching and counseling sessions designed to improve your performance and attitude, you have continued to demonstrate a lack of teamwork, a lack of involvement in your work assignments resulting in poor productivity, failed to show that you can adequately comprehend and follow directions, and most importantly you have demonstrated a poor attitude towards management, your co-workers and the requirements to successfully perform the duties of your position as Serviceman A.
>
> You are hereby required to attend and successfully complete Lineman A school at Whitehall and demonstrate on a daily basis that you can perform the duties of your position in order to progress to the top classification.  In addition, you are expected to treat management with respect, follow instructions given to you by Lead Line-workers and or management, and safely and satisfactorily perform your

work assignments.  You are expected to assist your co-workers as assigned and improve your productivity to acceptable levels.

As you know everyone in your classification is expected to progress to the A level.  Failure to demonstrate such progress in addition to correcting the behaviors and meeting the expectations identified above could result in further disciplinary action up to and including discharge.

(Def.'s App. Tab C.)  See Gladysiewski Dep. at 179-81, 188-89.

The letter included as an attachment the Work Performance Summary.  (Def.'s App. Tab G.)  Smith also gave Plaintiff a written Action Plan for Improving Work Performance ("Action Plan").  (Gladysiewski Dep. at 182, 289-90; Def.'s App. Tab H.)

The Action Plan set forth what Plaintiff needed to accomplish to progress back to the top of the Serviceman A classification, including: attend and successfully complete Lineman A School; demonstrate a working knowledge of and the skill requirements for Serviceman A duties and responsibilities; demonstrate active participation and involvement in all phases of the job planning and completion; demonstrate improved decision-making and sound judgment; demonstrate the ability to work independently; demonstrate improved ability to identify and correct faults to restore service; and demonstrate the ability and willingness to perform the duties of the Serviceman A position on a daily basis.  The Action Plan also provided for training and for Plaintiff to work with experienced Lead Linemen.  (Def.'s App. Tab H.)

Plaintiff reviewed each of these documents (the letter, the Work Performance Summary and the Action Plan) at that time.  (Gladysiewski Dep. at 181-82.)  Smith also read the letter aloud to Plaintiff, his Union representative, and Bowser and then they discussed the documents.  (Id. at 188-90.)  During the meeting, Plaintiff told Bowser that Allegheny's action was "ridiculous" and "absolutely crazy."  Plaintiff addressed Bowser because he believed that

7

Bowser "had to be the one to do this to me, not ... Mr. Smith." (Id. at 190.)

Plaintiff Files a Grievance

On October 12, 2004, Plaintiff and his Union representative prepared and filed a grievance to "protest the unfair action of the company." Plaintiff alleged that Allegheny demoted him without just cause and for reasons that he claimed were "trivial" and "meaningless," and he requested make-whole relief. (Gladysiewski Dep. at 195-96, 206 & Ex. 9.) Plaintiff did not claim that Allegheny violated any specific provision or term of the CBA, and he admits that he was not making any specific claims other than that he believed his demotion was unjust. (Id. at 196.)

Lead Linemen Write Letters Protesting Demotion

On October 13, 2004, Lead Lineman Michael Wright wrote a letter in which he stated that no one had consulted him prior to making the decision to demote Plaintiff, that he disagreed with it and that Plaintiff met and exceeded all his expectations. (Smith Dep. Ex. 2.)[6] On October 19, 2004, Lead Lineman Barry Heilman wrote a letter in which he stated that, based on his direct knowledge of Plaintiff's work, Plaintiff could perform all aspects of the Serviceman A position, he complied with all safety regulations, he was fully cooperative with Heilman and followed all of his instructions to the letter. (Smith Dep. Ex. 1.) Shortly after writing this letter, Heilman met with Bowser. During this meeting, Heilman complained about not being consulted prior to Plaintiff's demotion. Bowser responded that it would not have mattered. (Heilman Dep. at 17.)[7]

---

[6]Pl.'s App. (Docket No. 51) Ex. 2.

[7]Pl.'s App. Ex. 4.

<u>Plaintiff Files an NLRB Charge</u>

On or about January 7, 2005, Plaintiff filed a charge against Allegheny with the National Labor Relations Board ("NLRB"), alleging under certification of knowledge, truth and accuracy that Allegheny demoted him because he engaged in concerted activities with other employees. (Gladysiewski Dep. at 207-08 & Ex. 11.) Plaintiff testified that the "concerted activity" referred to his safety suggestions (i.e., that one-man crews should not be required to pull wires or climb poles) made approximately seven months earlier. (<u>Id.</u> at 208.) Plaintiff testified that he believed that he was demoted because of those safety suggestions, and he made no mention about alleged age discrimination. (<u>Id.</u> at 208-09.) Plaintiff testified that he thought Allegheny, specifically through Smith, Bowser, and the Company's human resources department, was "targeting me because I felt that job was unsafe for one man to do" and because he complained about safety issues. (<u>Id.</u> at 194.) Plaintiff notes that he also stated that management wanted someone younger who would do whatever they said without question. (<u>Id.</u> at 211.)

<u>Plaintiff Withdraws Grievance & NLRB Charge, Files With EEOC</u>

By letter dated February 7, 2005, Plaintiff withdrew the Union grievance challenging his October 8, 2004 demotion. (Gladysiewski Dep. at 205-06.) Plaintiff also withdrew his NLRB charge, because, according to him, the NLRB was the wrong venue to proceed on age discrimination claims. When asked when and how he came to that conclusion, Plaintiff testified that he did not recall when, and as to how, he stated, "[j]ust – I don't know"; "[j]ust by talking to people"; no one in particular. (<u>Id.</u> at 209.)

On January 27, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and it was cross-filed with the Pennsylvania

Human Relations Commission (PHRC).  The charge stated that "I was notified on October 8, 2004 that I was being demoted (Top A to Bottom B).  The reason given for my demotion was performance....  My age was forty-one (41) at demotion."  (Gladysiewski Dep. at 210-14 & Ex. 12.)

On April 27, 2005, the EEOC dismissed Plaintiff's charge of discrimination based upon its determination that as a result of its investigation, the agency was unable to conclude that the information obtained established a violation of the statutes.  (Pl.'s Second Am. Compl. ¶ 17 & Ex. 1.)[8]

Plaintiff Files a Second Charge

On or about June 10, 2005, Plaintiff filed a second EEOC charge alleging that Allegheny "set [him] up to terminate [him]" in retaliation for filing his EEOC discrimination charge and a worker's compensation claim.  (Gladysiewski Dep. at 262-63 & Ex. 18.)

Plaintiff's June 2005 EEOC charge and accompanying affidavit did not contain any specific instances of alleged retaliation.  (Gladysiewski Dep. Ex. 18.)  The EEOC dismissed Plaintiff's retaliation charge on September 22, 2005.  (Second Am. Compl. Ex. 2.)

Procedural History

Plaintiff filed this action on July 21, 2005.  He filed an amended complaint on November 28, 2005 (Docket No. 13) and a second amended complaint on March 23, 2006 (Docket No. 26).

Count I alleges that the October 8, 2004 demotion was an act of discrimination against him on the basis of his age in violation of the ADEA, and Count III repeats this allegation under the PHRA.  Count II alleges that he was retaliated against for having complained about

_____

[8]Docket No. 26.

discrimination, in violation of the ADEA, and Count IV repeats this allegation under the PHRA.

On August 30, 2006, Defendant filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Counts I, III – ADEA/PHRA Claims of Age Discrimination

Plaintiff alleges that Allegheny discriminated against him on the basis of age when it demoted him on October 8, 2004, in violation of both the ADEA and the PHRA. Allegheny moves for summary judgment with respect to these claims on the grounds that: 1) Plaintiff failed to raise his claim of age discrimination in his Union grievance or his NLRB charge, even though

he was familiar with the provisions of the CBA prohibiting age discrimination; 2) he cannot state a prima facie case of age discrimination because he points only to Sean Dickson, who is not a similarly situated individual and who did not replace him when he was demoted; and 3) even if he states a prima facie case, Allegheny has articulated a legitimate, non-discriminatory reason for his demotion and he has not pointed to evidence from which a trier of fact could conclude that this reason is a pretext for unlawful age discrimination.

Plaintiff responds that: 1) Defendant offers no support for its argument that he had to raise age discrimination claims in his Union grievance or his NLRB charge; 2) Dickson is similarly situated and did not have to replace Plaintiff under the circumstances of this case; and 3) he has pointed to numerous inconsistencies and implausibilities in Defendant's proffered reason, from which the trier of fact could conclude that it is a pretext.

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40.  29 U.S.C. §§ 623(a), 631(a).  Discrimination on the basis of age is also prohibited under the PHRA.  43 P.S. §§ 954(h), 955(a).  In the absence of direct evidence of discrimination,[9] a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc).  This model also applies to actions brought pursuant to the PHRA.  See Connors v.

---

[9]Plaintiff admits that he is not aware, and has no knowledge, of any statements making reference to his age or to age in general made by Smith, Bowser, or any other Allegheny manager.  (Gladysiewski Dep. at 216-17.)

Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1998).

The Court of Appeals for the Third Circuit has indicated that, to state a prima facie case of age discrimination, a plaintiff must establish that he is at least 40 years of age, that he is qualified for the position, that he suffered an adverse employment decision and that he was replaced by a sufficiently younger person to create an inference of age discrimination. Showalter v. University of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Issues Presented in Grievance and NLRB Charge

Defendant's first argument is that Plaintiff himself did not believe that his demotion was because of his age. In support, Defendant cites Plaintiff's failure to present the allegation of age discrimination in either his Union grievance or his NLRB charge, even though he could have done so and even though, as a Union member familiar with the terms of the CBA, he should have been aware of this fact. Plaintiff responds that this argument is without support.

During his employment, Plaintiff held positions with the Union as a safety committee person and as a shop steward, in connection with which he was responsible for enforcing the CBA and presenting and processing grievances, which involved meeting with Allegheny management, including his managers, Dave Smith and Jack Bowser.  (Gladysiewski Dep. at 9-13.)  Plaintiff is familiar with the terms of the CBA.  (Id. at 11, 350-52.)  Section 1.1 of the CBA contains an express prohibition against discrimination on the basis of age or any status protected by law.  (CBA § 1.1 at 2.)

Defendant notes that Plaintiff did not claim in his Union grievance that Allegheny violated any specific provision or term of the CBA, and he admits that he was not making any specific claims other than that he believed his demotion was unjust.  (Gladysiewski Dep. at 196.)  Specifically, Plaintiff made no reference to Section 1.1 of the CBA and he admits that he did not mention or complain about alleged age discrimination during the ensuing processing of the grievance.  (Id. at 204.)

Similarly, Defendant notes that Plaintiff's January 7, 2005 NLRB charge stated that Allegheny demoted him because he engaged in concerted activities with other employees concerning safety suggestions and did not allege age discrimination.  (Gladysiewski Dep. at 194, 207-08 & Ex. 11.)  Plaintiff notes that he also stated that management wanted someone younger who would do whatever they said without question.  (Id. at 211.)

However, as Plaintiff observes, Defendant cites no authority for its contention that he should be precluded from raising age discrimination claims in this case because he did not raise them in his Union grievance or his NLRB charge.  Defendant appears to be arguing, in a reversal of the roles of parties in discrimination cases, that Plaintiff's allegations of age discrimination in

14

this case should be considered "pretextual" because he did not raise them in earlier administrative proceedings.  However, this argument is without support in the law.  Plaintiff was required to administratively exhaust the age discrimination claims by raising them before the EEOC, 29 U.S.C. § 626(d), and he did so.  The law requires nothing more of him.

Prima Facie Case

Defendant admits that the demotion was an adverse employment action and that Plaintiff was in the age-protected group at the time.  (Docket No. 46 at 3 n.1)  However, it argues that Plaintiff cannot meet the fourth element of the prima facie case.  Specifically, it contends that he cannot compare himself to Sean Dickson because Dickson was in a different job classification, did not engage in the same conduct for which Plaintiff was demoted and did not replace him.[10]

Similarly Situated Employee

Defendant contends that Plaintiff cannot compare his situation to Dickson's because they were not similar "in all relevant respects."  It argues that Plaintiff cannot point to an Allegheny Lineman or Serviceman A working at the Kittanning Service Center on October 8, 2004 who was substantially younger than he was and who was not demoted even though he: 1) failed and

_____

[10]Defendant also suggests (in a footnote in its reply brief) that because Dickson, who was born on December 4, 1970 (Dickson Dep. 21-22), was only seven years and ten months younger than Plaintiff and therefore was not "sufficiently younger" to support an inference of age discrimination.  (Docket No. 56 at 1 n.2.)  However, the Court of Appeals has never drawn a bright-line test for what is considered a sufficiently younger comparator.  Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (citations omitted).  Defendant cites Narin v. Lower Merion School District, 206 F.3d 323 (3d Cir. 2000), in which the court appears to suggest that less than seven years is an insufficient amount.  Id. at 333 n.9.  However, it is unlikely that the court would make such a holding–more severe than that of several other circuits–in a footnote after discussing the plaintiff's evidence of pretext and without further explanation.  Moreover, Dickson is more that seven years younger than Plaintiff, and thus Narin would be distinguishable in any event.

refused to demonstrate his knowledge of safe work practices, including when asked by managers; 2) failed or refused to complete assigned work tasks, to follow instructions, and to make himself available for additional work assignments; 3) demonstrated a poor attitude toward management, including being argumentative and refusing to respond to work and safety-related requests for information; 4) demonstrated a lack of teamwork, including admittedly attempting to agitate co-workers; 5) indicated an unwillingness to perform certain routine work practices (climbing poles and pulling wires by himself); and 6) failed or refused to demonstrate improved work performance after counseling.  (Docket No. 46 at 5.)

This argument should be rejected for two reasons.  First, the term "similarly situated individual" does not mean "identically situated."  Bennun v. Rutgers State Univ., 941 F.2d 154, 178 (3d Cir. 1991).  In that case, the court rejected a university's argument that Bennun, a professor who was denied promotion to full professor, could not compare himself to Somberg, another professor who received the promotion, because Somberg was rated outstanding in two categories, teaching effectiveness and general usefulness, and Bennun was not rated as highly in these categories.  The court held that "even if Somberg was a 'teaching-oriented' professor and Bennun was a 'research-oriented' professor, as Rutgers contends, a comparison between the two can be made to determine if Rutgers' five objective criteria for advancement to full professor were evenly applied."  Id.

Defendant argues that Dickson was not a Serviceman A in October 2004 when Plaintiff was demoted.[11]  However, Plaintiff contends that Dickson rose through the ranks (Dickson Dep.

_____

[11]Dickson was a Lineman B on October 8, 2004, became a Lineman A in December 2004 and progressed to the maximum step of the Lineman A progression in December 2005.  (Smith
(continued...)

at 5, 33-34),[12] and was not demoted as he was although Dickson demonstrated performance problems similar to the ones he is accused of having.  Defendant cites no authority for the argument that Dickson had to be a Serviceman A in October 2004 when Plaintiff was demoted and this argument should be rejected.

Second, Defendant's argument relies upon the assumptions that: 1) Plaintiff was responsible for all of the failings identified in the October 2004 Work Performance Summary; and 2) Dickson did not have all of these failings.  In other words, Defendant has referenced its proffered reason for Plaintiff's demotion in the course of articulating why he cannot state a prima facie case of discrimination.  To require Plaintiff to rebut this reason in order to establish a prima facie case of discrimination improperly imports into the prima facie analysis the later stages of the McDonnell Douglas test.

> As cogently explained by the Sixth Circuit:
>
> a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case.  To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

Wexler v. White's Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (en banc) (citing Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000)).  See also Thomas v. Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir. 1997) ("relying on a defendant's reasons for the adverse employment action as a basis for ruling against a plaintiff at the prima facie stage raises

---

[11](...continued)
Supp. Decl. ¶ 11, Def.'s Supp. App. (Docket No. 60) Tab A.)

[12]Pl.'s App. Ex. 5.

17

serious problems under the <u>McDonnell Douglas</u> framework because it frustrates a plaintiff's ability to establish that the defendant's reasons were pretextual."); <u>Davenport v. Riverview Gardens Sch. Dist.</u>, 30 F.3d 940, 944 (8th Cir. 1994) ("by requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action–in other words, to prove pretext and the ultimate issue of intentional discrimination.  The prima facie case is not so onerous.")

Plaintiff has also presented evidence, in the form of deposition testimony from Lead Linemen Michael Wright and Barry Heilman, that they had problems with Dickson, in that he caused delays in the morning, worked slowly during the day, and did not possess adequate technical skills.  (Wright Dep. at 14-16;[13] Heilman Dep. at 24-28.)  Defendant argues that Heilman and Wright are not management and are not responsible for evaluating employee performance.  However, it has not explained why Plaintiff cannot submit evidence from individuals who are familiar with Dickson's performance in the field (whether they made the ultimate employment decisions about him or not) to attempt to demonstrate that Dickson received more favorable treatment.  For purposes of the prima facie case, Plaintiff has demonstrated that Dickson is "similarly situated" to him.

<u>Dickson Did Not Replace Plaintiff</u>

Defendant also argues that Plaintiff cannot compare himself to Dickson because Dickson did not "replace" him when he was demoted.  Plaintiff responds that this element is inapplicable to this case.

---

[13]Pl.'s App. Ex. 3.

It is true that the Court of Appeals has stated, with respect to the fourth element of the prima facie case, that the plaintiff must show "in the case of a demotion or discharge, [he] was replaced by a sufficiently younger person to create an inference of age discrimination." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998) (citation omitted). However, the court has also recognized  "that the elements of a prima facie case depend on the facts of the particular case." Jones v. School Dist. of Phila., 198 F.3d 403, 411 (3d Cir. 1999). See also Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352-53 (3d Cir. 1999) (concluding that a woman did not have to demonstrate that her position was filled by a man in order to state a prima facie case of gender discrimination, only that men were treated more favorably).  Indeed, in McDonnell Douglas itself, the plaintiff was an African-American who had engaged in an unlawful traffic obstruction as a form of protest at the employer's location, but the Supreme Court held that he could still maintain a case of racial discrimination arising out of the employer's failure to rehire him if he could proffer evidence that he was treated more severely than white employees who had engaged in the same conduct.  411 U.S. at 804.

It is clear from the context that, in the demotion cases cited above, the employee was replaced by another individual, who either was sufficiently younger to create an inference of age discrimination (in which case the plaintiff could state a prima facie case of discrimination) or was not (in which case, the plaintiff could not state a prima facie case).  In this case, Defendant has stated that "[t]here is no fixed number of classification progressions at the Kittanning Service Center, and every line and serviceman is expected to advance through the progression to the A classification."  (Bowser Decl. ¶ 7.)  In other words, Defendant's own statements establish that Plaintiff was not "replaced" by anyone when he was demoted and thus the question of whether he

was replaced by a sufficiently younger person is not applicable.  Rather, Plaintiff can satisfy the fourth element in this case by "showing that similarly situated non-protected employees were treated more favorably."  Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002) (citation omitted).

Average Age of Plaintiff's Co-Workers

Finally, Defendant suggests that its lack of age discrimination can be inferred from an overall view of Plaintiff's department.  It notes that, in October 2004, when Plaintiff was reclassified from Serviceman A to B, Allegheny employed approximately 13 Linemen and Servicemen at the Kittanning Service Center who held classifications from Line and Serviceman B to A, to Lead Lineman.  (Faulk Decl. ¶ 4; Gladsiewski Dep. at 26-29.)  The average age of these 13 individuals in October 2004 was 46.4 years.  (Faulk Decl. ¶ 5.)  Of the 13 individuals, Plaintiff, 41 years at the time, was younger than all but three, one Lineman was 34 and two were about the same age as Plaintiff at 40.  In October 2004, the only other Servicemen A working at the Kittanning Service Center were ages 56 and 58.  (Faulk Decl. ¶ 6; Gladsiewski Dep. at 26-27; Bowser Decl. ¶ 12.)

Defendant cites no authority for its implied argument that the fact that Plaintiff was one of the younger members of his department demonstrates that his demotion was not based on his age, an argument that would be inapplicable in this case in any event.  See generally Antonio v. The Sygma Network, Inc., 458 F.3d 1177, 1184 (10th Cir. 2006) ("In disparate treatment cases, overall employment statistics have little bearing on the specific intentions of the employer in making particular employment decisions.")

Sean Dickson was born on December 4, 1970.  (Dickson Dep. at 21-22.)[14]  Plaintiff has identified Dickson as the only employee he claims is a similarly situated substantially younger employee.  (Pl.'s Resp. Def.'s First Set Interrogs. No. 6.)[15]  Thus, whether or not other members of Plaintiff's department were older than he was yet were not demoted is not relevant to the facts of this case.  See Simpson, 142 F.3d at 646 (noting that pointing to one similarly situated individual not in the protected group who was allegedly treated more favorably "may be acceptable at the prima facie stage of the analysis.")

Plaintiff belongs to a protected group, was qualified for his position and suffered an adverse employment action while a similarly situated individual received more favorable treatment.  Therefore, he has stated a prima facie case of age discrimination.[16]

Defendant's Proffered Reason

The burden of production therefore shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's demotion.  It cites the reasons identified in the October 2004 Work Performance Summary, namely the following:

---

[14]Def.'s App. Tab K.

[15]Def.'s App. Tab J.

[16]Defendant also notes that decisionmakers Jack Bowser (who was 47 in 2004, Bowser Decl. ¶ 4) and Dave Smith (who was 49, Smith Dep. at 7) are older than Plaintiff, thus invoking the "same-group inference."  (Docket No. 46 at 7 n.6.)  However, the Supreme Court has stated that "it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (citation omitted).  Although Oncale was a race and sex discrimination case, several courts have held that there is "no reason why the same reasoning should not apply to age discrimination cases."  Wexler v. White's Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (en banc).  See Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 361 (7th Cir. 2001).

12/01/99 Unable to identify and resolve customer trouble after numerous trips.

5/30/2002 Verbally harassed co-workers for doing out of town RS work.  Failure to follow company policy and procedures.

02/04/2003 Unable to accurately locate switching points and identify material needed to restore service.

02/06/2003 Refusal to pay attention during work assignments and failure to follow work as assigned.

02/28/2003 Refusal to fill out Equipment Checklist and became argumentative.

03/10/2003 Refusal to fill out DOT Log and became argumentative.

03/11/2003 Did not leave service center with other scheduled crew members for a pre-arranged work assignment involving an interruption at the Clarion SC.  Then 45 minutes later claimed that you did not know the directions to the worksite, which were given the day before.  Co-worker waiting for him in the truck.

03/12/2003 Counseled on the events of the past several months.  Reviewed the Lineman A Description of duties.  When asked multiple times if he could perform Lineman A duties, Todd['s] response was "I think."  Todd was instructed to work safe, be at his desk on time, work with his lead lineman, load the trucks and not sit around in the morning, complete required reports and turn them in on time and accurately.

03/18/2003 Made Lead Line-worker re-explain the same work assignment multiple times and then told Lead Lineman that you were not going to do the bucket work.

04/06/2004 Unable to complete routine single man work assignment.  Claimed that two employees were needed to complete this particular assignment.  Requested review of work practice through SQ&T.  During the review he was unable to describe how the work could be performed alone.

05/13/2004 Backing accident after parking in high traffic area.

06/03/2004 Demonstrated poor judgment skills by trying to wash the service truck in a restricted carwash area designed for cars.

06/14/2004 Failure to complete assigned trouble call after work.  After locating and isolating the trouble, you called another crew that was working on a different case of trouble to complete the work while you went home.

22

07/28/2004 Unable and unwilling to participate in Rubber Cover Up Training Presentation.  Failed to demonstrate a working knowledge of the application and use of rubber goods needed for safeguarding yourself from energized conductors and facilities.

08/04/2004 During a scheduled interruption, sitting in the truck while other crews were actively working to complete the assigned project.  Demonstrated an unwillingness or inability to actively participate in the project.

09/09/2004 Lack of callout acceptance.  Todd does not accept callouts after work.  Over the past 21 months Todd has only accepted one callout out of approximately 139 calls.

09/18/2004 Failure to follow instructions.  During RS event instructed to report to the Service Center at 0700 on 09/19/2004 or call Storm Center with his status.

(Def.'s App. Ex. G.)

In his declaration, Smith reviews and expands upon these incidents.  (Smith Decl. ¶¶ 9-18.)  Defendant has met its burden of production.  Therefore, Plaintiff is required to point to evidence from which the trier of fact could conclude that Defendant's proffered reason is a pretext for unlawful age discrimination.

Plaintiff's Evidence of Pretext

Plaintiff proceeds along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason.  Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Plaintiff presents the following arguments: 1) he disputes that some of the incidents occurred, notes that in some instances he was merely requesting assistance to perform tasks more efficiently, observes that no harm occurred to anyone based on his alleged poor judgment and points out that his questions were later justified; 2) Lead Linemen who knew his work in the field were not consulted prior to the demotion, disagreed with the criticisms made in the Work

Performance Summary and complained to management that the demotion was wrong; 3)

Allegheny did not follow its own Action Plan; 4) Allegheny claims he was demoted for failing to

follow safety precautions, yet it assigned him the most dangerous work thereafter; 5) he was

suddenly found to be deficient after eight successful years as a Serviceman A, in contrast to

previous positive reviews and good scores on Allegheny's productivity index; and 6) Sean

Dickson rose through the ranks despite the fact that Lead Linemen considered him deficient in

certain areas.

<u>Plaintiff Disputes Whether Incidents Occurred/Severity</u>

Plaintiff argues in his brief that he disputes whether some of the incidents occurred, but

the record in this case does not support this argument.  Rather, as summarized below, he admits

seven of the incidents completely, and admits three other incidents for the most part and argues

only with management's conclusions or the weight that was attached to these events.

Defendant states that all of the facts presented in its Concise Statement, including the

facts surrounding the incidents cited in the Work Performance Summary, should be "deemed

admitted" even when Plaintiff has denied them and cited to the record in support of his denial

because he "relies upon immaterial, incorrect, conclusory, and/or unsupported assertions to

support purported denies, which do not actually deny or dispute Allegheny's statements of fact."

(Docket No. 56 at 1 n.1.)  Local Rule 56.1 does not operate in this highly technical fashion.

Thus, only when Plaintiff responds "admitted" is the fact admitted.

Upon reviewing the record, the evidence is undisputed that Plaintiff admits, in their

entirety, the following incidents from the Work Performance Summary: 1) the May 30, 2002

incident in which he harassed his co-workers for doing out-of-town work (Pl.'s Resp. Def.'s

24

Statement Undisputed Material Facts ¶ 28);[17] 2) the February 4, 2003 incident in which he was unable to accurately locate switching points and identify material needed to restore service (Id. ¶ 29); 3) the February 28, 2003 incident in which he refused to complete forms and became argumentative; 4) the similar incident on March 10, 2003 (Id. ¶ 32); 5) the May 13, 2004 incident in which he had a backing accident after parking in a high traffic area (Id. ¶ 40); 6) the June 3, 2004 incident in which he demonstrated poor judgment skills by trying to wash his service truck in a restricted carwash area designed for cars (Id. ¶ 41); and 7) the September 9, 2004 observation that he had accepted only one call-out of approximately 139 calls (Id. ¶¶ 45-46).

With respect to three other incidents, Plaintiff attempts to explain his actions, but does not dispute them: 1) as to the March 11, 2003 incident in which he did not leave the service center with other crew members but waited for Dave Smith, Plaintiff explains why he did so (he believed Smith would arrive shortly), but does not deny that he did not know the directions to the worksite, which had been given the day before, or that he could have called the crew that left to ask for directions instead of waiting for Smith, regardless of how short the wait turned out to be (Pl.'s Resp. ¶ 33); 2) as to the June 14, 2004 incident in which he failed to complete a trouble call, Plaintiff indicates that Barry Heilman was the individual who decided to call in another crew and contends that there is no record that the customer experienced any delays, but he does not deny leaving the job unfinished (Id. ¶ 42); and 3) as to the July 28, 2004 incident in which he failed to demonstrate a working knowledge of the use of rubber goods for safeguarding, he claims that he knew the answer to the question but "thought he was being set up" but does not deny that he did not respond to a question asked of him.  (Id. ¶ 43.)

---

[17]Docket No. 52.

Most of the remaining incidents fall into two categories: 1) incidents in which he is accused of not working with his Lead Linemen, which he counters with statements from and a petition signed by various Lead Linemen; and 2) incidents involving his insistence that a job could not be safely performed without a second employee, despite management's conclusion to the contrary, which he counters with management's failure to follow its own Action Plan and his assignment to increased stringing work in the bucket truck.[18]

Lead Linemen's Comments

The Work Performance Summary states that, on March 18, 2003, Plaintiff made a Lead Lineman re-explain the same work assignment multiple times and then told the Lead Lineman that he was not going to do the bucket truck work.  Smith states that he "learned from several Lead Linemen that Plaintiff had repeatedly questioned their instructions, and Lead Lineman Bruce Connor told me that he would not lead another stringing job with Plaintiff."  (Smith Decl. ¶ 14.)

Plaintiff responds with positive comments from Lead Linemen.  As noted above, shortly after the demotion, Plaintiff approached Lead Linemen Michael Wright and Barry Heilman, who both wrote letters in which they stated that no one had consulted them prior to making the decision to demote Plaintiff, that they disagreed with it and that Plaintiff met and exceeded all expectations.  (Smith Dep. Exs. 1, 2.)  After signing his letter, Heilman met with Bowser and complained about not being consulted prior to Plaintiff's demotion but Bowser responded that it would not have mattered.  (Heilman Dep. at 17.)  In addition, Plaintiff drafted the statement

---

[18]Plaintiff denies the August 4, 2004 incident in which he is accused of sitting in the truck while other crews were working and the September 19, 2004 incident in which he is accused of failing to report to the Storm Center at 7:00 a.m. or to call in with his status.

26

"Todd Gladsiewski is a knowledgeable, efficient and cooperative lineman and I would work

with him at any time" and circulated it among Kittanning Service Center employees.  This

petition-like document was signed by Bruce Connor, Jeff Brumbaugh, Tim Medice, Michael

Wright, Barry Heilman, Larry Burdick and Mark Baum.  (Smith Dep. Ex. 3.)

      Plaintiff also notes that, of the seventeen alleged incidents in the Work Performance

Summary, eight involved allegations of poor technical skills, failure to follow instructions of the

Lead Lineman and/or failure to follow safety regulations.  Moreover, the Action Plan placed

specific emphasis on Plaintiff's climbing skills.  (Gladsiewski Dep. Ex. 6.)[19]  Yet he

successfully completed the climbing portion of the skills assessment test in less than one-third of

the allotted time.  (Gladsiewski Dep. at 324-25.)  Heilman also stated in his letter that Plaintiff

"willingly and safely climbs any pole and does so with skill."  (Smith Dep. Ex. 1.)

      Defendant argues that comments by Lead Linemen should be disregarded because they

are not management and are not responsible for making decisions about Plaintiff's performance.

See CBA § 1.1 at 2 (excluding supervisors from the bargaining unit of which Plaintiff, Heilman,

and Wright are members); id. at 135-38 (Lead Linemen are members of the bargaining unit); id.

§ 9.11, at 23, § 26.1 at 100 ( "Management" is the "sole and final judge" of a person's

"qualifications," including assessing a person's "ability to perform a job or to accept increased

responsibility" for purposes of, among other things, promotion and demotion).  See also

Gladsiewski Dep. Ex. 7 (Serviceman A Job Description) (stating that employees will advance to

Serviceman A from a lower classification "based on qualifications as determined by

management.")

_____

[19]Pl.'s App. Ex. 1.

However, Plaintiff can refer to comments by Lead Linemen to the extent that Allegheny's proffered reason for his demotion – failure to work with his Lead Linemen – is contradicted by the very individuals who worked with him in the field and would be aware of his performance. In particular, Smith's statement that Bruce Connor said he would not lead another stringing job with Plaintiff appears to be contradicted by Connor's signature on the petition stating that he would work with Plaintiff at any time.

Nevertheless, Plaintiff cannot rely on the evidence presented by the Lead Linemen in this case to demonstrate pretext for the following reason: management's decision to demote him was not based solely or even primarily on his questioning of and failing to work with Lead Linemen. Rather, as explained above, many of the criticisms were the result of direct observations made by Dave Smith of incidents that Plaintiff admits occurred.

A plaintiff in a discrimination case must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005). In Kautz, the plaintiff, a regional sales manager, successfully argued that the sales-by-region statistic used by his employer to evaluate him was not relevant to the comparison of individual performance, but since the company also used another non-suspect statistical method to narrow the field, the court held that he did not demonstrate pretext. Id. at 469-72. The Lead Linemen's positive comments do not contradict the incidents observed and documented by Smith and/or admitted by Plaintiff and do not demonstrate pretext.

Failure to Follow Action Plan

Plaintiff argues that Defendant failed to follow its Action Plan in two respects: 1) it did not rotate Lead Linemen every two months; and 2) it did not increase his crew visits until he filed

28

a charge of discrimination.  Defendant explains why it did not rotate Lead Linemen every two months, disputes that his crew visits decreased and increased to the extent he claims and argues that neither issue demonstrates pretext.

Plaintiff points out that Allegheny did not provide him with a different Lead Lineman every two months as set forth in the Action Plan.  (Gladysiewski Dep. at 309-10.)  He notes that the Action Plan provides that "Crew rotations with experienced Lead line-workers will occur on a bi-monthly basis to provide maximum diverse training opportunities...." (Gladysiewski Dep. Ex. 6.)

Plaintiff indicates that the first change should have occurred some time in January 2005, that his Lead Lineman was changed in February 2005; again in or about August 2005; and then again in or about March 2006.  (Gladysiewski Dep. at 310-12.)  Barry Heilman stated that crew rotations regularly occur for all employees at approximately six month intervals.  (Heilman Dep. at 13-15.)

Defendant states that, in October 2004, when Allegheny gave Plaintiff his Action Plan, it intended to assign him a different Lead Lineman every two months; however, subsequent staffing decreases and employee transfers over which Allegheny had no control, made doing so not feasible.  Specifically, three Lead Linemen bid into other jobs, and Allegheny was not able to readily replace them.  (Smith Decl. ¶ 25; Bowser Decl. ¶ 27.)

Plaintiff contends that there must have been sufficient Lead Linemen remaining because he rotated among them on the normal staff rotation and that these Lead Linemen had crews assigned to them throughout the relevant period.  (Gladysiewski Dep. at 310-14; Heilman Dep. at 13-15.)

Plaintiff also argues that Allegheny did not meet its commitment to provide increased observation to help him improve his performance (until he filed a charge of discrimination).[20]  He notes that the Action Plan specifically provided that his progress would be "measured and monitored by continuous management crew audits, coaching and counseling sessions with experienced managers . . . and feedback from Lead line-workers and peers."  (Gladysiewski Dep. Ex. 6.)

As an initial matter, even assuming Allegheny failed to follow through on statements made in the Action Plan, it is unclear how this failure constitutes evidence that the deficiencies identified in the Work Performance Summary were a pretext for unlawful age discrimination. However, viewing the evidence in the light most favorable to Plaintiff, it does not support his argument for pretext.  That is, it leads only to the inference that Allegheny (for whatever reason) did not provide all the support for Plaintiff that it promised, not that it was unimportant for him to meet the Company's expectations as outlined in the Action Plan.  See Simpson, 142 F.3d at 648-49 (employee's argument that employer failed to follow through on promised training and counseling led only to an inference that the employer did not consider it important to assist her in achieving stated goals, not that it was unimportant for her to improve training on her own accord).

Assigning Him Increased Stringing Work

Plaintiff argues that he can point to an inconsistency in Defendant's proffered reason in that he was demoted primarily for allegedly failing to follow safety procedures, yet was then

---

[20]The issue of increased crew visits is discussed in greater detail in the retaliation discussion below.

assigned the most dangerous work available.  He also insists that stringing work is not required

of a Serviceman B, the position he currently holds.  Defendant disputes both the factual predicate

for this argument and the result.

Defendant states that there has been an increase in stringing work in the Kittanning

Service Center area due to the capacity limits of the Center's infrastructure and all Linemen have

seen an increase in this type of work.  (Smith Decl. ¶ 24; Bowser Decl. ¶ 26.)

However, Plaintiff contends that he went from performing stringing work 20-30% of the

time to doing it 80-90% of the time and that he was consistently assigned the bucket truck, the

more dangerous aspect of the job.  (Gladysiewski Dep. at 303-06.)  In addition, while Plaintiff

admits that stringing work is part of the job, he contends that the job that it is a part of is the

Lineman/Serviceman A position, while Plaintiff was demoted to a Serviceman B.  (Id. at 306.)

Some of this evidence should be construed in Plaintiff's favor, specifically the amount of

stringing work he was assigned and being assigned to the bucket truck.  Contrary to Defendant's

contention, the Court can also accept Plaintiff's contention, based on his own statements, that

being assigned to the bucket truck is more dangerous than other stringing work as he can testify

to this from his own knowledge and it has presented no evidence to the contrary.

However, the evidence is not in dispute that stringing work is expected of Servicemen B.

Smith states that "[t]he Serviceman B Employee Qualification Guide includes stringing work,

which falls under the work of installing, removing, and repairing energized primary circuits and

associated equipment at numbers 26 and 27."  (Smith Supp. Decl. ¶ 7.)  See Gladysiewski Dep.

Ex. 8.  The record is also undisputed that Plaintiff was expected to rise through the ranks to the

level of Serviceman A, which also included stringing work as a requirement.  See Def.'s App.

31

Tab C ("everyone in your classification is expected to progress to the A level.")

In addition, the record is clear that management had considered Plaintiff's primary complaint that certain work be performed by a two-man crew and had rejected it. Ted Frantz, Manager of Safety and Quality Assurance for Allegheny (Frantz Decl. ¶ 1),[21] states that:

> In or about April 2004, the work practices of pulling service wire and climbing poles by oneself was [sic] reviewed by the safety department and found to be safe and routine tasks that servicemen and linemen have traditionally done and that any Serviceman A should be able to accomplish safely and efficiently as a one-person crew.

(Frantz Decl. ¶ 3.) See also Bowser Decl. ¶ 18.

Although Plaintiff may believe otherwise, his own beliefs do not create a genuine issue of material fact. "The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." Keller, 130 F.3d at 1109 (citation omitted). The fact that Plaintiff (or even his co-workers) may believe that management's decisions regarding safe procedures were incorrect does not create evidence from which the trier of fact could conclude that Allegheny's decision to demote him in October 2004 in part because he refused to perform bucket truck work by himself was an instance of unlawful age discrimination.

Moreover, Plaintiff has not explained how the work he was assigned after the demotion demonstrates that Allegheny's proffered reason for the demotion is a pretext for unlawful age discrimination. Allegheny did not believe that Plaintiff was incapable of performing Serviceman A work. To the contrary, it contends that Plaintiff stated that he was unsure whether he could do it. See Smith Decl. ¶ 13 (Smith asked Plaintiff if he could perform Serviceman A duties and he

---

[21]Def.'s App. Tab I.

responded "I think.")

Prior Performance Reviews

Plaintiff has submitted a performance evaluation issued on August 13, 2003, in which Smith rated him at "meets standards" in all categories. (Gladysiewski Dep. Ex. 3.)[22]  Defendant responds that this evaluation is immaterial, because a number of events and incidents that culminated in Plaintiff's demotion occurred after this performance review.  It also notes that he received no "exceeds standards" ratings, and, among other things, the appraisal lists the following as "areas of development": focus on safety, continue to improve productivity, work quality, and interaction with management.  (Id.)

Plaintiff has also submitted a performance evaluation issued on March 29, 2004, in which Smith rated him as "meets standards" in every category but productivity, in which he was rated as "below standards."  (Gladysiewski Dep. Ex. 4.)[23]  Defendant again states that it is immaterial because a number of incidents and events that culminated in the October 8, 2004 demotion occurred after this performance review.  Also, Defendant notes that, on page 2 of the evaluation (not included by Plaintiff in his appendix), he received no "exceeds standards" ratings, and, among other things, the appraisal lists the following under "areas of development": "increase focus on job assignments and reduce outside distractions" and "continue to improve interaction with manager."  (Gladysiewski Dep. Ex. 4.)[24]

Finally, Plaintiff has submitted a performance evaluation issued on January 27, 2006 and

---

[22]Pl.'s App. Ex. 1.

[23]Pl.'s App. Ex. 1.

[24]Def.'s Supp. App. Tab B (full 2-page copy of evaluation).

given to him on April 28, 2006, in which Smith rated him between "proficient" and "needs improvement" in nearly every category.  (Smith Dep. Ex. 4.)  In many of the categories, Smith gave the relatively low rating despite making positive comments.  Heilman and Wright stated at their depositions that they disagreed with this evaluation and that Plaintiff has been performing Lineman A work consistently and well.  (Wright Dep. at 22; Heilman Dep. at 35-36.)  Heilman, who worked in the Kittanning Service Center until March 2006, further stated that many of Smith's comments are inaccurate as Plaintiff did not stand back in the mornings until told what to do or fail to help in stocking the trucks.  (Heilman Dep. at 36-37.)

Defendant replies that this performance evaluation is immaterial because Plaintiff was promoted three months before it was written, in October 2005, because he completed Lineman A school and showed some improvement in other areas.  (Smith Supp. Decl. ¶ 10.)  It also notes that Plaintiff's characterization of the contents of the performance evaluation – as to the relative standing of ratings and comments – is not supported by the record.  He received a mid-point rating of 2.5 on a scale of 1 to 5, which is neither high nor low, it is in the middle.  (Smith Dep. Ex. 4.)  The appraisal contains both positive and critical comments, e.g., "Todd still stands back in the morning and waits to be told what to do," "he will speak some days and some days he will not," and "he is not taking any call-outs and if there is any scheduled overtime he declines." (Smith Dep. Ex. 4.)

"The attempt to use past positive reviews to show that more recent criticism was pretextual fails as a mater of law."  Kautz, 412 F.3d at 474 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992)).  Thus, neither of the earlier reviews can be used to demonstrate pretext.  In addition, the 2006 evaluation is not at issue in this case.

34

Productivity Index

Plaintiff states that Defendant utilizes a productivity index which computes every employee's weekly productivity by comparing the actual time it took an employee to finish a certain job with a standard time for completing that type of task that is computed by Allegheny. (Gladysiewski Dep. at 232-35.)[25]  He notes that, in the productivity index sheets for 2004, he consistently achieved a productivity index rating within the top half of the Kittanning employees. (Dickson Dep. Ex. 4.)[26]  He further notes that, in the productivity index sheets for 2005, his productivity index decreased significantly. (Id.)  While reviewing the sheets, Plaintiff noted that in May and June 2005, he received far lower productivity index scores than other individuals who worked the same exact job with Plaintiff throughout the week being rated. (Gladysiewski Dep. at 232-35.)

Defendant responds that the productivity index was not a factor in Plaintiff's October 2004 demotion nor in the decisions not to progress him to the middle step of the B classification in April of 2005 or to the top of the B classification in April of 2006.  It argues that Plaintiff's productivity index is immaterial because there is no record evidence that any productivity index numbers were a factor in any decision he challenges.

The Court of Appeals has stated that "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action.  The employee's positive performance in another category is not relevant, and neither is the employee's judgment as to the importance of the stated criterion." Simpson, 142 F.3d at 647 (citations omitted).  As

---

[25]Pl.'s App. Ex. 1.

[26]Pl.'s App. Ex. 5.

the Court of Appeals has noted, "it is axiomatic that the mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext unless the method that was used is so deficient as to transgress the <u>Fuentes</u> standard." <u>Kautz</u>, 412 F.3d at 471 (citations omitted).

Defendant has stated that it did not utilize the productivity index in its decision to demote Plaintiff in October 2004 and there is no evidence that it did so. Nor has he shown that Defendant's use of factors other than the productivity index was implausible, inconsistent, incoherent or contradictory. Thus, Plaintiff's references to his scores on the productivity index are irrelevant.

<u>Comparison to Sean Dickson</u>

Finally, Plaintiff attempts to demonstrate pretext by comparing the treatment he received to that received by Sean Dickson. As noted above, he has submitted evidence, in the form of testimony by Lead Linemen Barry Heilman and Michael Wright, that they had problems with Dickson, including that he caused delays in the morning, worked slowly during the day, and did not possess adequate technical skills. (Wright Dep. at 14-16; Heilman Dep. at 24-28.)

Defendant notes that Plaintiff has presented no evidence that management was aware of these alleged deficiencies about Dickson observed by Heilman and Wright. In fact, Heilman testified that he "never said anything to management." (Heilman Dep. at 27.) Moreover, Defendant states that there is no evidence that Dickson: 1) refused without explanation to respond to questions by management about safety procedures; 2) failed to improve performance deficiencies even after counseling; 3) deliberately agitated co-workers; 4) and did not accept call-outs. On the other hand, Defendant notes that in 2003, Smith decided not to progress Dickson

from the first step B lineman classification to the maximum classification because of his lack of qualifications.  (Dickson Dep. at 34-35; Smith Decl. ¶ 21.)

As noted above, at the pretext stage of the analysis, Plaintiff must delve more deeply into whether he and Dickson are "similarly situated."  Simpson, 142 F.3d at 646.  He has submitted a few general observations made by Lead Linemen that Dickson caused delays in the morning, worked slowly during the day, and did not possess adequate technical skills.  But he has presented no evidence that management was aware of these issues and Heilman testified that he did not report them to management.  In addition, Allegheny has proffered testimony that it did hold Dickson back when the situation warranted it.

By contrast, Plaintiff had documented conduct, including numerous incidents observed directly by management, that formed the reason for his demotion.  He also admits many of these incidents, although he offers explanations, disagreements concerning safety issues and his own belief that some incidents were not as serious as management states they are.  Under the circumstances, he has not demonstrated that he and Dickson were "similarly situated" such that management's failure to demote Dickson constitutes evidence that his own demotion was a pretext for unlawful age discrimination.

Plaintiff has failed to proffer evidence from which the trier of fact could conclude that Defendant's proffered reason for his October 2004 demotion – the deficiencies outlined in the Work Performance Summary – was a pretext for unlawful age discrimination.  Therefore, with respect to Counts I and III of the complaint, Defendant's motion for summary judgment should be granted.

Counts II, IV - Retaliation Claims

37

In Counts II and IV, Plaintiff alleges that Defendant retaliated against him for engaging in protected activity in violation of the ADEA and the PHRA, respectively. Defendant moves for summary judgment as to these claims on several grounds.

Discrimination against an individual who has opposed a practice prohibited by the ADEA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute is itself actionable conduct. 29 U.S.C. § 623(d). The same is true under the PHRA. 43 P.S. § 955(d).

The Court of Appeals has long held that:

> To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action.

Weston v. Commonwealth of Pa., 251 F.3d 420, 430 (3d Cir. 2001) (citations omitted). The PHRA follows the same standards. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).[27]

Recently, the Supreme Court altered the analysis for evaluating retaliation claims. The Court rejected the position taken by the Third Circuit and others that an employee must point to an adverse employment action: "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2412-13 (2006). However, "a

---

[27]Plaintiff admits that he has no knowledge of anyone from Allegheny ever making reference to his EEOC charge, including in connection with the events that he claims were retaliatory. (Gladysiewski Dep. at 268-69, 282-83, 287.)

plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citations omitted).

As summarized by the Court of Appeals, the prima facie case elements are now as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006).

Defendant does not challenge the fact that Plaintiff engaged in protected activity and the law is clear that his EEOC charge filed on January 27, 2005 constitutes protected activity for purposes of the ADEA and the PHRA. Abramson v. William Paterson College of N.J., 260 F.3d 265, 287-88 (3d Cir. 2001). However, it contends that Plaintiff cannot point to any evidence of an adverse employment action or an action that a reasonable employee would have found to be materially adverse and that he cannot demonstrate a causal connection between his protected activity and the decisions about which he complains. In addition, it argues that it has presented legitimate, non-discriminatory reasons for the actions about which he complains and that he has not presented evidence from which the trier of fact could infer that these reasons were a pretext for unlawful retaliation discrimination.

The allegations of retaliation that Plaintiff is pursuing in this case consist of the following: 1) he was withheld from step progressions in April 2005 and again in April 2006; 2)

39

he was consistently assigned to the most dangerous job (stringing electrical wires using the bucket truck), which he contends is outside of his Serviceman B grade; 3) he was removed from the out-of-town list; and 4) he was subjected to vastly increased crew visits.  (Docket No. 50 at 9.)[28]

Withholding of Step Progressions

Plaintiff claims that Allegheny retaliated against him by "stopp[ing] [him] from ever having another promotion."  (Gladysiewski Dep. at 263.)  Plaintiff claims that he was denied promotions because of retaliation after his October 2004 reclassification from Serviceman A to B, first in April 2005, when he claims that he should have been moved up in the progression to Lineman B, first step, and again in April 2006.  (Id.. at 264-66, 274-76.)

Plaintiff's statement is exaggerated, as he admits that Allegheny moved him up in the progression from Lineman B, minimum progression, to Lineman B, first step, in October 2005.  (Gladysiewski Dep. at 265-66, 275).  See also Smith Dep. at 67 ("I'm seeing some progress [by Plaintiff] and I want to see him succeed.")

Although Plaintiff believes that the progression should have been automatic, he acknowledges that when he moved up the progression in the past, after periods of approximately

_____

[28]The complaint also contained allegations of the following additional actions: he was placed in the Accident Repeater Program, was forced to attend Lineman A school, was made to report information to the medical review officer, lost opportunities for teaching positions, was denied overtime opportunities, was made to take a November 2005 skills assessment, and was put on the secondary call-out list and rarely received trouble calls.  In his response, Plaintiff admits Defendant's dispositive facts about these incidents and he limits the discussion in his brief to the four actions cited in the text.  With respect to the issue of not being provided with a new Lead Lineman every two months as provided in the Action Plan, Plaintiff's response to Defendant's Concise Statement of Material Facts raises this issue, although his brief does not. He has not explained how a reasonable employee would find this action materially adverse. Thus, to the extent he is raising it, it does not qualify as an instance of retaliation.

six months in the lower progression, he was not working under an Action Plan.  (Gladysiewski

Dep. at 278.)  When asked whether progression is based only upon the passage of time, Plaintiff

responded "[t]ime and experience" and he stated that, although Smith was the individual

responsible for determining whether he had sufficient line work experience to move up, "he has

no idea what line work really is.  He can only guess at it."  (Id. at 266-67.)

> Smith states that:
>
> > Allegheny did not progress Plaintiff every six months.  As of April 2005,
> > Plaintiff had failed to attend Lineman A School, which was dictated by the Action
> > Plan and necessary for progression.  Additionally, Plaintiff was still not accepting
> > call-outs, and his work performance was not consistently meeting expectations
> > that had been outlined to him previously.  I communicated these short fallings in
> > Plaintiff's quarterly reviews and in other meetings with Plaintiff.

(Smith Decl. ¶ 20.)

Plaintiff admits that he had not completed Lineman A school by April 2005, but he notes

that the progression during this period would not have been to the grade of Lineman/Serviceman

A but to higher steps within the grade of Lineman/Serviceman B. (Gladysiewski Dep. at 264-66,

274-76.)  He contends that completion of schooling for a particular grade is necessary for

advancement to that grade, but not for progression within a lower grade.  (Id. at 15.)  Lineman A

school was offered in July 2005.  (Id. at 321-24.)  Plaintiff was paid for attending the school, and

he was given exemplary marks by the evaluators, scoring in the 95.6 to 96 percentile overall.  (Id.

at 321-22.)

Even accepting Plaintiff's contention that he did not need to complete Lineman A school

to receive the step progression in April 2005, he has not responded to Smith's observation that

his work performance was not consistently meeting expectations that had been outlined to him

previously and were communicated to him subsequently and he has admitted that he was not

41

accepting call-outs.  Although Plaintiff may disagree with Smith's ability to assess his line work, the fact remains that Smith was responsible for doing so and Plaintiff is not in a position to second-guess Smith's conclusions.

With respect to the issue of call-outs, Plaintiff admitted that he did not accept any calls he received.  (Gladysiewski Dep. at 288.)  He testified that "[w]e are not required to take any trouble calls."  (Gladysiewski Dep. at 174.)[29]  However, Bowser states that "[i]t is a known job requirement for linemen to be subject to calls for reasons such as restoring service, and it is expected that employees accept such calls."  (Bowser Decl. ¶ 19.)  As noted above, "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action.  The employee's positive performance in another category is not relevant, and neither is the employee's judgment as to the importance of the stated criterion."  Simpson, 142 F.3d at 647 (citations omitted).

The failure to promote could constitute an adverse employment action or an action that a reasonable employee would find materially adverse.  However, assuming (without deciding) that Plaintiff has set forth a causal connection between his charge of discrimination and the failure to be promoted, Defendant has proffered legitimate, non-discriminatory reasons why it did not promote him (he was still not accepting call-outs, and his work performance was not consistently meeting expectations) and he cannot demonstrate that these reasons are a pretext for unlawful retaliation discrimination based upon his own opinion of his performance or his belief that accepting call-outs was not a requirement of his position.

Assignment to Stringing Work in Bucket Truck

--------

[29]Pl.'s App. Ex. 1.

Plaintiff claims that in the early part of 2005 he was assigned to more stringing work in the bucket truck, which he contends is more dangerous work and not part of his duties as a Serviceman B.  (Gladysiewski Dep. at 303-10.)  He insists that this constituted an adverse employment action because he is being paid at a Serviceman B rate for performing Serviceman A work.  (Id. at 309.)

Smith states that:

> Beginning in 2004, before he filed his EEOC Charge, Plaintiff was assigned to work with Lead Linemen Heilman on the Worthington project, which involved substantial stringing work in November and December 2004.  After a weather-related hiatus in January 2005, when the amount of stringing work on this project decreased, the stringing work increased in the normal course in February 2005 and through March 2005 when the project was completed.  The Ford City project, which involved stringing work, started thereafter and continued through September 2005.  Plaintiff was assigned to work with Lead Linemen who were assigned to the Ford City project.  Between the completion of the Worthington project and the beginning of the Ford City project, there was no significant amount of stringing work to be performed.

(Smith Supp. Decl. ¶ 8.)

As summarized above, the record is undisputed that performing stringing work is expected of a Serviceman B, that Plaintiff was expected to rise to the position of Serviceman A which also included performing stringing work and that management examined his concern that certain work could only be safely performed by a two-man crew and rejected it.  Thus, even if being assigned more stringing work in the bucket truck were an action that a reasonable employee would find materially adverse (as opposed to a job requirement) and even assuming that he could demonstrate a causal connection between his charge of discrimination and being assigned this work, Defendant has proffered a legitimate, non-discriminatory reason why this work increased (the particular projects required it) and he has not proffered evidence from which

43

a trier of fact could conclude that the reason is a pretext for unlawful retaliation discrimination.

Removal from Out-of-Town List

Plaintiff states that, during an "out-of-town" trip, Linemen/Servicemen can earn substantially more money than they would working at their normal station.  (Gladysiewski Dep. at 291-92, 294-96).  Defendant acknowledges that "bargaining unit employees are paid a 5% premium on all paid wages in connection with work performed for another electric utility requesting mutual assistance for restoration of service."  (Smith Supp. Decl. ¶ 12.)  See CBA § 14.8, at 70.[30]

Plaintiff states that he was not given any reason for being removed from the "out-of-town" list.  (Gladysiewski Dep. at 293-94.)  Defendant responds that Plaintiff indicated at his deposition that he understood that he "was moved down into a secondary list for going out of town."  (Id. at 291.)  Also, in connection with his claim about missing an out- of-town work opportunity, Plaintiff admitted that he did not get the assignment "[b]ecause they made me a bottom B man."  (Id. at 293.)  Defendant maintains that, to the extent it did not give Plaintiff a reason for his standing for out of town work assignments as of August 2005, it was because Plaintiff's standing was dictated by the CBA and Plaintiff did not otherwise ask for a reason. Smith informed him that his name was moved from the primary list used for out-of-town assignments; Plaintiff asked only what his standing was then relative to others; and he did not ask why his name was moved.  (Id. at 297.)

Smith states that:

Allegheny did not make a specific communication to Plaintiff about the

_____

[30]Def.'s Supp. App. Tab C.

44

effect of his Serviceman B classification upon his standing for out of town work; it does not make specific communications to employees in this respect; and this matter of standing likely would have first presented itself in connection with the next out of town work opportunity that arose, which was in the August 2005 time frame.

(Smith Supp. Decl. ¶ 13.)

Plaintiff claims that in or about August or September 2005, he was next on the out-of-town list, a list which he believes operates purely on a seniority basis (as opposed to classification). (Gladysiewski Dep. at 291-92, 294-96.) Plaintiff further claims that he was taken off that list and, as a result, Sean Dickson and Ricky Dunn (who have less seniority than he did) moved up and went on an out-of-town trip instead of him in August or September 2005 in connection with Hurricane Katrina. (Id. at 291.) Plaintiff claims that this was done to retaliate against him for his having filed a charge of discrimination. (Id. at 294.)

Smith states that Allegheny assigns out-of-town work to those employees holding A classifications, in order of seniority. When Plaintiff was reclassified to Lineman B, consistent with Company practice, Plaintiff was moved to another list and placed on that list by seniority. As he was not a Lineman A, Plaintiff was not eligible to remain on the Primary Call-Out List. (Smith Decl. ¶ 22.)

Plaintiff states that when he was working his way up through the ranks he was on the same rotation for out-of-town work as the other employees. In addition, he contends that the Defendant equates the out-of-town list with the call out-list when they are two different things.

In a supplemental declaration, Smith explains that:

The provisions at Section 13.11 of the CBA, which state that call-out lists shall be classified as "Primary Lines List," including all lead lineworkers and line and Servicemen A, and as "Secondary Lines List," including line and servicemen B, control and govern call-outs for out of town work.... In connection with

45

> Hurricane Katrrina there was a request for two Kittanning linemen; we ran the list and the peg was at Kittanning Service Unit Lineman A Steve Cass; Mr. Cass declined, and the next two Kittanning Service Unit Linemen A on the Primary List, Rick Dunn and Sean Dickson, accepted the assignments.  The list did not get to Plaintiff.  Plaintiff was offered the next out-of-town assignment to Morgantown, WV on October 25, 2006.

(Smith Supp. Decl. ¶ 6 & Ex. 1.)  See CBA § 13.11 at 45-46.  Even if the section of the CBA cited by Defendant does not explicitly state that it applies to out-of-town work as well as the regular "call-out" list, Allegheny has proffered the testimony of a manager that this is the way the provision was interpreted.

Plaintiff has not pointed to any other section of the CBA that refers specifically to out-of-town work as opposed to the call-out list.  He has not even suggested a reason why, as a Serviceman B, he would be entitled to remain on the primary out-of-town list when the CBA clearly provided that he be placed on the secondary call-out list.  In any event, he cannot create a genuine issue of material fact by offering his own opinion as to how the out-of-town list works when Defendant has submitted the actual section of the CBA and its reasonable interpretation of this section and Plaintiff has cited no evidence to the contrary.  Thus, assuming that being placed on the secondary out-of-town list constitutes an action that a reasonable employee would find materially adverse and assuming that Plaintiff established a causal connection between filing his charge of discrimination and being placed on this list, Defendant has proffered a legitimate, non-discriminatory reason for why it did so (as a result of Plaintiff's demotion to the Serviceman B position) and he has not pointed to evidence from which a trier of fact could conclude that this reason is a pretext for unlawful retaliation discrimination.

<u>Increased Crew Visits</u>

Plaintiff claims that he was subjected to more supervision than other employees in

46

retaliation for filing his January 2005 EEOC discrimination charge.  He admits that he

experienced crew visits and audits (i.e., supervision in the field by operations and safety

managers) before he filed his EEOC discrimination charge, but claims that, during a two-week

period in March 2005 the visits increased dramatically, specifically ten visits in a twelve-day

period.  (Gladysiewski Dep. at 298-300.)  Barry Heilman described this amount of visits as

"unmentionable" and stated that normally only one crew visit is made per month.  (Heilman Dep.

at 30-31.)  After this two-week period, the number of crew visits decreased somewhat, but he

still experienced far more crew visits than other crews.  (Gladysiewski Dep. at 300.)  Michael

Wright also confirmed that he received far more crew visits when Plaintiff was on his crew.

(Wright Dep. at 18.)  He also noted that during these crew visits, Plaintiff has been made to redo

work unnecessarily while exactly identical work of coworkers goes unchallenged.  (Wright Dep.

at 20-21.)

>Bowser states that:

>>Allegheny managers routinely observe and supervise employee
>>performance.  As part of Plaintiff's Performance Improvement Plan, Allegheny
>>committed to provide Plaintiff with observations.  Plaintiff was assigned to work
>>on stringing jobs in Worthington and Ford City.  Because these jobs are larger and
>>more complex, managers tend to audit and observe employees on these types of
>>jobs more often than other types of jobs.  Further, while observing Plaintiff,
>>managers also observed other employees who were assigned to those jobs

(Bowser Decl. ¶ 25; see also Smith Decl. ¶ 23.)

Defendant also notes that Plaintiff admits that he was never reprimanded or disciplined

for any reason in connection with the visits; he never complained to anyone about them; and that

he was given positive feedback from supervision.  (Gladysiewski Dep. at 299-301.)  Plaintiff has

not demonstrated that increased crew visits, which were part of his Action Plan for improvement,

constitute an action that a reasonable employee would find materially adverse.  Even assuming that he met this burden and that he demonstrated a causal connection between his filing a charge of discrimination and these increased crew visits, however, Defendant has proffered a legitimate, non-discriminatory reason for them (he was assigned more complex jobs that called for them) and he has not pointed to evidence from which a trier of fact could conclude that this reason is a pretext for unlawful retaliation discrimination.

In conclusion, with respect to the incidents of retaliation that Plaintiff is pursuing, he has not demonstrated that they constitute actions that a reasonable employee would find materially adverse and, even assuming that he met this burden and that he demonstrated a causal connection between his filing a charge of discrimination and these incidents, Defendant has proffered legitimate, non-discriminatory reasons for them and he has not pointed to evidence from which a trier of fact could conclude that this reason is a pretext for unlawful retaliation discrimination. Therefore, with respect to Counts II and IV of the complaint, Defendant's motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 45) be granted.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

48

/s/   *Amy Reynolds Hay*
AMY REYNOLDS HAY
United States Magistrate Judge

Dated:   26 February, 2007


cc:      Hon. David Stewart Cercone
         United States District Judge

         All counsel of record via Notice of Electronic Filing